Below is an Opinion of the Court.

RANDALL L. DUNN
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | Bankruptcy Case |
| Fountain Village Development, | ) | No. 09-39718-rld11 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| Fountain Village Development, | ) | |
| | ) | Adv. Proc. No. 10-03018-rld |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| Weiner Investment Co. and | ) | |
| Clear Channel Outdoor, Inc., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

On March 30 and 31, 2011, I received evidence and heard testimony and argument at the trial ("Trial") on the amended complaint of Fountain Village Development ("Debtor"), seeking declaratory relief and damages for trespass against Weiner Investment Co. ("Weiner") and Clear Channel Outdoor, Inc. ("Clear Channel"), and on Weiner's counterclaims, also for declaratory relief and damages for trespass, against Debtor. I

Page 1 - MEMORANDUM OPINION

1  further toured the subject real properties in the presence of the parties

2  and their counsel the following morning, April 1, 2011.  At the

3  conclusion of the Trial, I took the matter under advisement.

4        In deciding this matter, I have considered carefully the

5  testimony presented and the exhibits admitted at the Trial, and the

6  parties' arguments, presented both in legal memoranda and orally at the

7  Trial.  I also have reviewed relevant legal authorities, both as

8  presented by the parties and as found in my own research.

9        In light of that consideration and review, this Memorandum

10 Opinion sets forth the court's findings of fact and conclusions of law

11 under Federal Rule of Civil Procedure 52(a), applicable in this Adversary

12 Proceeding under Federal Rule of Bankruptcy Procedure 7052.

13                          <u>Background</u>

14        I am asked by the parties to this dispute to determine who has

15 rights to a revenue stream generated by advertising on a 4-story wall

16 ("Wall") in downtown Portland.  The Wall has been in existence for more

17 than a century.  Weiner and its predecessors have leased the Wall for

18 advertising purposes to various third parties since 1952.  No one

19 questioned Weiner's right to do so until 2007, when Debtor acquired the

20 building the Wall adjoins and to which the Wall is attached.

21        The dispute involves two parcels of real property in the block

22 between SW 2nd and SW 3d Avenues in Portland, each bordered by SW

23 Washington Street on the north.  The eastern parcel, owned by Weiner, is

24 known as Lots 1 and 2, Block 19.  I will refer to it as the Weiner Lot.

25 Except for the Wall and a freestanding billboard, both of which Weiner

26 leases to Clear Channel as advertising space, the Weiner Lot is operated

Page 2 - MEMORANDUM OPINION

as a surface parking lot under an independent lease. The western parcel, known as Lots 7 and 8, Block 19, is owned by Debtor. Lots 7 and 8 are developed with a 4-story building constructed around 1900. I will refer to Lots 7 and 8 as the Postal Building or the Postal Building Lot.

In 1885, the Portland Savings Bank building occupied a substantial portion of the Weiner Lot. In 1888, Portland Savings Bank built an addition to the existing structure, which encompassed the remainder of the Weiner Lot, and which is referred to as the Kraemer Building. The western wall of the Kraemer Building terminated just over the property line of the Postal Building Lot, which at the time was not developed. The historical record evidences that the western wall of the Kraemer Building was subject to a "party wall" agreement dated July 26, 1888, between Portland Savings Bank and the owner of the Postal Building Lot, who at that time was Henry Failing. See Exhibits 16, 17 and 18. The party wall agreement was never recorded and was lost sometime prior to September 7, 1900.

However, evidence both of its existence and of its terms is documented in a declaration executed September 7, 1900 by the receiver ("Receiver") for the Portland Savings Bank. The declaration also served as the Receiver's petition to the Multnomah County Circuit Court to sell to Henry Failing's heirs "half of the said party wall up to and including four stories thereof" for the "reasonable value" of half of the basement and four stories of the Wall, which was stated to be $1,520. The petition also reflects that the Failing heirs were "about to construct a four-story and basement building upon the property adjoining the said Portland Savings Bank, and intends [sic] using the party wall aforesaid."

Page 3 - MEMORANDUM OPINION

The petition was approved by an order of the court dated September 15, 1900. The Receiver's acknowledgment of receipt of payment of the $1,520 from the Failing heirs was recorded March 2, 1927, the same date on which the Failing heirs sold the Postal Building Lot, improved with the Postal Building, to the Alderpark Holding Company. The recorded transfer to the Alderpark Holding Company states that the Postal Building Lot was "free from all incumbrances save and except . . . the party wall agreement affecting Lots One and Two in Block 19 . . . ." Surveys of the Weiner Lot conducted in 1919 and 1925 both reference the Wall as a party wall. See Exhibits 4 and 5. A survey prepared by Chase, Jones & Associates, Inc. on March 24, 2010 ("2010 Survey"), sets forth all points at which the Wall encroaches upon the Weiner Lot. See Exhibit 10.

On September 28, 1951, Fred H. Reimers, then the owner of the Weiner Lot, obtained a permit from the City of Portland ("City") to demolish the Kraemer Building.[1] See Exhibit 13. As relevant to this dispute, the City's Report of Inspection states: "The west wall is a party wall with the 4-story Class VI Postal Bldg. @ corner of SW 3d & Washington . . . There was doubt as to whether [the party wall was] properly tied into above [building]." The City refused to permit demolition of the Kraemer Building more than one story below the top of the Postal Building unless the Postal Building was properly tied into the Wall. A separate permit was issued December 11, 1951, for the purpose of tying beams of the Postal Building to the Wall on its east side because the Kraemer building was being demolished, which would leave no proper

_____

[1] The Portland Savings Bank building had been removed at some previous date.

Page 4 - MEMORANDUM OPINION

wall ties.  <u>See</u> Exhibit 14.  The Postal Building was tied to the Wall,
and demolition of the Kraemer Building was completed not later than
January 31, 1952.

On January 10, 1952, Mr. Reimers and his wife leased the now
bare Weiner Lot for a five-year term to third parties, who were to use
the property to construct and operate a surface parking lot.  The parking
lot lease expressly excluded "that part of the premises occupied by party
walls serving [the Postal Building]."  <u>See</u> Exhibit 21.  On March 7, 1952,
the Reimers leased to another third party "the East and exterior face of
the West wall of the former Kraemer Building, located on Lots 1 and 2,
Block 19, Portland . . ." for a ten-year term, "for the purpose of
painting thereon or attaching thereto, and maintaining advertising signs,
including necessary structures, devices, illumination and connections."
<u>See</u> Exhibit 22.  Clear Channel is the current lessee of the Wall for
advertising purposes.

In 1955, Ben and Bertha Weiner purchased the Weiner Lot
together with assignment of the existing leases.  <u>See</u> Exhibits 20 and 23.
The Weiners transferred their interest in the Weiner Lot to Weiner on
April 1, 1960, which has owned it from that point forward.  <u>See</u> Exhibit
24.

As noted above, the Wall has been used for advertising since
1952.  For nearly half a century, all advertising on the Wall has been
subject to recognized rights held by Weiner, including, on occasion,
advertising for tenants of the Postal Building.  For example, Exhibit 26
reflects that in 1992, Weiner leased ("Gallery Lease") a "10 feet high by
20 feet long" space on the Wall to The Vault Gallerie, which was at the

Page 5 - MEMORANDUM OPINION

time a tenant of the Postal Building, for a three-year term, in exchange for delivery to Weiner of two "serigraphs . . . along with papers of authenticity," which would "represent [The Vault Gallerie's] entire rent for the initial three-year period in full." The Gallery Lease provided that a five-year extension would follow the initial three-year term, with the monthly rent to be $135 for the first year of the extended lease term, increasing annually until the monthly rent reached $200 for the fourth and fifth years of the extended lease term. The Gallery Lease stated, "It is understood that said display may only advertise The Vault Gallerie, and is done as a 'neighbor courtesy' to [The Vault Gallerie's owner] from [Weiner]."

In 1984, Postal Building Associates, Inc., then the owner of the Postal Building, requested permission from Weiner to open portions of the Wall for the addition of windows as part of an extensive renovation of the Postal Building. Postal Building Associates, Inc. proposed to pay Weiner $1,000 immediately, "plus $500 for each year the openings are in place," and further agreed to close the openings if Weiner was to build on the Weiner Lot and needed use of the Wall. See Exhibit 33. Weiner rejected the proposed lease of property rights because "the stipend proposed" was too minimal. See Exhibit 34. In 1987, Postal Building Associates, Inc. again contacted Weiner, this time seeking approval for Postal Building Associates, Inc. to paint the Wall at its own expense in order to "brighten up" the Wall to complete the general face lift that had been given to the Postal Building. See Exhibit 55.

Debtor acquired the Postal Building through a Bargain and Sale Deed recorded November 1, 2007. Almost immediately Debtor demanded a

Page 6 - MEMORANDUM OPINION

share in the revenues that were being generated by advertising on the Wall. As early as December 12, 2007, Weiner sent a letter ("December 2007 Letter") to John Beardsley, who owns fifty percent of the Debtor, the purpose of which was to "go on the record" regarding the Wall and the respective rights of the Weiner Lot and the Postal Building Lot in and to the Wall. <u>See</u> Exhibit HH. The December 2007 Letter was precipitated by Weiner having learned that Mr. Beardsley recently had "paid a personal visit and spoke with" Clear Channel's Real Estate Manager, Dan Dhruva, regarding the right to use the Wall for advertising purposes. In the December 2007 Letter, Mr. Weiner emphatically advised Mr. Beardsley that the Debtor had no rights to any revenue generated by advertising on the Wall.

> Making sure that you know, the wall to which [Weiner] has exclusively leased space to [Clear Channel] (and their predecessors for the past fifty years), is a <u>completely separate concrete party wall</u> and you do not have any rights to the Weiner side of the wall. That wall is a <u>party wall</u> . . . <u>No</u> owner of the Postal Building has ever received one cent of revenue from our own side of the <u>party wall</u>. (Emphasis in original.)

At trial, Mr. Weiner testified that he had no response to the December 2007 Letter until Weiner was served with the complaint in this adversary proceeding, which was filed January 25, 2010. Tr. of March 30, 2011 Trial at 180:12-25. However, as evidenced by an e-mail communication to an unrelated third party dated February 6, 2008, Mr. Beardsley continued in his efforts to secure advertising revenue with respect to the Wall by soliciting the interest of current advertisers in working directly with him rather than through Clear Channel.

Page 7 - MEMORANDUM OPINION

1    Clear Channel has been advised by the owner of the
     parking lot that houses the free standing sign that he
2    also owns a remainder party wall that sits abutting the
     Postal Building's east wall.  That assertion is incorrect
3    because the City of Portland's records indicate that the
     wall was demolished in the early '50s down to at least
4    the ground floor level.  A physical inspection of the
     remainder wall demonstrates that the remainder wall might
5    exist on the Northernmost part of the lot, but it doesn't
     exist at the Southernmost, mid-block, part of the lot.
6    Therefore, the lot's owner has been charging Clear
     Channel for wall space that he doesn't own, and Clear
7    Channel has been charging its customers for display space
     that they have no right to.
8
     I am about to commence legal action against the property
9    owner and Clear Channel which will result in the removal
     of the panel signs from the Postal Building.
10
     ....
11
     I am not happy with Clear Channel's response to my
12   inquiries to date so I am not motivated to enter into any
     further relationship with them after the legal action is
13   concluded.

14   See Exhibit 38.

15          In the Amended Complaint, Debtor alleges that Weiner and

16   Clear Channel have trespassed and continue to trespass on Debtor's

17   property by anchoring or bolting stretched fabric billboard signs

18   directly into the Postal Building's easterly wall.  Based on this

19   alleged trespass, Debtor asserts entitlement to (1) recovery of

20   rent that has been paid by Clear Channel to Weiner for use of the

21   Wall, (2) recovery of damages for attachment of the billboard signs

22   to the Wall, (3) prejudgment interest on the foregoing amounts, and

23   (4) an injunction against Weiner and Clear Channel's "continuing

24   trespass."  In addition, Debtor requests a judgment declaring that

25   it is the owner of the Postal Building's easterly wall and that any

26   party wall agreement encumbering the Postal Building terminated

Page 8 - MEMORANDUM OPINION

1  when the Kraemer Building was demolished.

2      Through its counterclaims, Weiner seeks a declaration that
3  it is the owner of the portion of the Wall that encroaches upon the
4  Weiner Lot, based either upon its rights in the Wall as a party
5  wall, or based upon a prescriptive easement.  If ownership of the
6  Wall is determined to be vested in the Debtor, Weiner seeks damages
7  for trespass based upon the continuing encroachment of the Postal
8  Building on the Weiner Lot.  Independent of the determination of
9  who owns the Wall, Weiner seeks damages against Debtor based on the
10  alleged intrusion into the air space of the Weiner Lot of certain
11  electrical equipment attached to the Wall, which services the
12  Postal Building.

13                              <u>Discussion</u>

14  I.      <u>Requests for Declaratory Relief</u>

15      Whether either Debtor or Weiner can assert a claim for
16  trespass requires first that I determine the parties' property
17  rights with respect to the Wall.  Accordingly, I address first
18  Debtor's contention that it owns the Postal Building's easterly
19  wall and that any previously-existing party wall agreement
20  terminated when the Kraemer Building was demolished.

21      A.  <u>The Wall is a Party Wall</u>

22      A party wall may be defined generally as a wall
        located upon or at the division line between
23      adjoining landowners and used or intended to be used
        by both in the construction or maintenance of
24      improvements of their respective tracts, or more
        briefly, as a dividing wall for the common benefit
25      and convenience of the tenements which it separates.

26  <u>Sobien v. Mullin</u>, 783 A.2d 795, 798 (Pa. Super. Ct. 2001) quoting

Page 9 - MEMORANDUM OPINION

40 Am. Jr. Party Walls § 2 at 485 (1942).  Under the foregoing definition, the Wall is a party wall.

> Very often in the construction of such a party-wall, one of the landowners is perfectly willing to have the wall constructed partly upon his land, but because he is not desirous of improving his lot at the time objects to the payment of one-half of the cost at that date.  In such cases there is usually an express agreement entered into under which one landowner, called the builder, is authorized to construct the party-wall partly on the lot of the other, the non-builder, at the former's expense, but the non-builder covenants to pay one-half of the cost or value of such wall when he elects to use the wall for support of a building.

2 American Law of Property:  A Treatise on the Law of Property in the United States § 9.21 (Little, Brown and Co. 1952).

It appears from the historical record that this is exactly the circumstance with respect to the creation of the Wall and of rights related to the Wall.

We know that the owner of the Weiner Lot was the "builder" of the Wall.  Because half of the Wall was constructed on the Postal Building Lot, we can presume that at the time the Wall was constructed, Mr. Failing, the owner of the Postal Building Lot was "perfectly willing" to have the Wall built partly on his land. "Evidence" as to the existence of a party wall agreement, and to its terms, is contained in the declaration of the Receiver.  We can infer from the Receiver's declaration that at the time the party wall was built, Mr. Failing did not want to pay one-half of the cost.  Thus, when his heirs wanted to construct the Postal Building, they first had to acquire the rights to do so.  This they did by their payment of $1,520, presumably one-half of the cost of

Page 10 - MEMORANDUM OPINION

construction of the Wall, to the Receiver pursuant to the party wall agreement.

Debtor attempted to refute that the Wall was a party wall through the testimony of a structural engineer, Blake Patsy. Mr. Patsy testified that in his opinion, the existing Wall at all times was the separate easterly wall of the Postal Building. He based this opinion on his inspection by drilling into the Wall at several places, which established to his satisfaction that the Wall was "one contiguous wall." On cross-examination, Weiner's consulting engineer, Kevin McCormick, admitted that at least some part of the Postal Building's wall was built when the Postal Building was constructed in 1900.

Mr. Patsy also opined that there had been a separate wall that had been the westerly wall of the Kraemer Building, but that wall had been demolished in the 1950s. He based his opinion on the inspection reports, which talk about "demoing" [demolishing] the walls of the Kraemer Building, his knowledge of common thicknesses for walls of buildings "of that type" around Portland, and on his experience with other buildings of similar type.

While I find Mr. Patsy's factual testimony with respect to the wall structure persuasive, _i.e._, that it is a single wall, I am unable to accept his conclusions that the Wall at all times was independent of the Kraemer Building. These conclusions amount to speculation, and are based, in my view, on a faulty interpretation of the historical record. First, immediately prior to the construction of the Postal Building, the Failing heirs paid for and

Page 11 - MEMORANDUM OPINION

acquired rights in the Wall.  Second, I find nothing in the City of
Portland permits issued during the demolition of the Kraemer
Building to suggest that a separate wall was entirely demolished
when the Kraemer Building was taken down.  To the contrary, the
inspection report states that "the west wall [of the Kraemer
Building] is a party wall with the . . . Postal Building."

        The record does not support Debtor's contention that any
party wall that existed did not survive the demolition of the
Kraemer Building.  That the Wall continues in existence is
evidenced by the City of Portland permits issued at the time the
Kraemer Building was demolished, and by the 2010 Survey documenting
the Wall's encroachment on the Weiner Lot.

        As reflected in the City of Portland records, demolition
of the Kraemer Building was conditioned upon the Postal Building
first being tied to the Wall.  As Debtor points out in its trial
memorandum, "[t]he steel brackets used in that task remain visible
on the exterior of the Postal Building today."  Plaintiff's Trial
Memorandum at 3:23-24.

        Debtor dismisses the importance of the 2010 Survey by
arguing only that "it is well known that there was and is a great
deal of encroachment among historic buildings in downtown
Portland."  Id. at 5:11-12.  This statement omits any critical
analysis as to why such encroachments might have been common.  The
fact that a party wall agreement was entered into between Portland
Savings Bank and Mr. Failing at the time the Wall was constructed
clearly suggests the intent of the parties at that time that the

Page 12 - MEMORANDUM OPINION

Wall encroach as a benefit to each lot. The creation of the Wall
as a party wall in the first instance excludes the possibility that
any encroachment was accidental or happenstance. The fact that
City of Portland ordinances around the turn of the century defined
and referred to party walls further suggests they were created
intentionally. <u>See, e.g.</u>, The General Ordinances of the City of
Portland, Oregon (In Force January 2d, 1905), Ordinance 14109,
Section 3 ("'Party Wall' means a wall that separates two or more
buildings, and is used or is to be used jointly by said
buildings.").

The Wall was a party wall at the time it was created. The
Weiner Lot did not lose its rights in and to the Wall after the
Kraemer Building was demolished.

B. <u>Debtor Has Only An Easement of Support in the Wall</u>

Having concluded that the Wall is a party wall and that
both landowners shared equally in the cost of constructing the
Wall, we now turn to what rights each landowner holds in the Wall.

Party wall rights are created by statute, contract or
prescription. <u>Sobien v. Mullin</u>, 783 A.2d at 798. No Oregon
statute provides for the creation of party walls. Thus, any rights
Weiner and Debtor have with respect to the Wall arise from contract
or prescription.

> Where a party-wall is constructed by agreement
> between two adjoining landowners so that part of the
> wall rests upon the land of each, the English courts
> hold that the wall is owned by the two landowners not
> in severalty but in tenancy in common. But in the
> United States the courts uniformly hold that each
> landowner owns in severalty that portion of the wall

Page 13 - MEMORANDUM OPINION

resting upon his lot with an easement for support in
the other owner's portion of the wall.  Thus, there
exists separate ownership by each landowner of a
portion of the wall with a mutual cross easement for
support appurtenant to the lot of each.

2 <u>American Law of Property</u> §  9.21.

The "American" view was adopted by the Oregon Supreme
Court in 1893.

A party wall is a wall built partly on the land of
another for the common benefit of both.  The
adjoining owners are not joint owners, or tenants in
common, of the party wall.  "Each is possessed in
severalty of his own soil up to the dividing line,
and of that portion of the wall which rests upon it;
but the soil of each, with the wall belonging to him,
is burdened with an easement or servitude in favor of
the other to the end that it may afford a support to
the wall and buildings of such other."

<u>Odd Fellows Ass'n v. Hegele</u>, 32 P.2d 679 (Or. 1893)(citation
omitted).

The only evidence in the record relating to the party wall
agreement is that it existed and that the Debtor acquired rights in
the Wall as a party wall.  Thus, Debtor has established only that
it (1) owns the portion of the Wall which is on its property, and
(2) holds an easement for support in the entire Wall.

Debtor has no right to the revenue from the advertising
leases through a claim of ownership in the portion of the Wall
which is on the Weiner Lot, <u>i.e.</u>, the Wall surface which is leased
for advertising purposes.  Nor is there evidence that Debtor holds
any easement which creates a right to that revenue.

First, there is nothing in the record to establish that
the party wall agreement created an easement in favor of the Postal

Page 14 - MEMORANDUM OPINION

Building Lot other than one limited to the support of the Postal Building generally provided by the existence of a party wall.  The Debtor has not been restricted from this use as reflected in the inspection and permit records created at the time the Kraemer Building on the Weiner Lot was demolished.

Second, under Oregon law, one "essential qualit[y]" of an easement is that it "confer[s] no right to a participation in the profits arising from such property." Monese v. Struve, 62 P.2d 822, 825 (Or. 1936).  In the absence of an express grant of a property interest in the advertising revenue, no such right exists. Debtor has not provided any evidence that it holds such an interest.

As an alternative to its arguments that Debtor owns or has acquired rights to the advertising revenue, Debtor asserts that the Weiner Lot lost any rights in and to the Wall when the Kraemer Building was demolished and Weiner stopped using the easement of support in the Wall.  As clarified by the Oregon Supreme Court, however, the easement of support is lost only when a party wall becomes unfit and unsuitable for use. Odd Fellows Ass'n, 32 P.2d at  679.  Although the Weiner Lot currently does not use the Wall for support, it retains that right.  In addition, as the owner "in severalty" of the portion of the Wall on the Weiner Lot, Weiner is free to make any legal use of the Wall it wishes.  That the City of Portland has issued permits for advertising on the Wall establishes that advertising is a legal use of the Wall.

///

Page 15 - MEMORANDUM OPINION

C.  <u>Easement By Prescription</u>

> A prescriptive use is acquired if the use has existed uninterruptedly for fifteen years, under a claim of right, and has been open, visible and continuous . . . The burden of proof is on the person claiming the prescriptive easement and there must be a fair preponderance of the evidence that the use was adverse.

<u>WAD Realty, Inc. v. LiCamele</u>, 472 A.2d 352, 353-43 (Conn. App. 1984)(citations omitted).  However, where a wall straddles two properties, there is no need to establish an easement in the wall by prescription.  <u>Gimbel Bros., Inc. v. Markette Corp.</u>, 307 F.2d 91, 96 n.1 (3d Cir. 1962).

The Wall straddles the Weiner Lot and the Postal Building Lot.  Because it is on Weiner's Lot, Weiner owns the face of the Wall.  Thus, Weiner does not need to establish the existence of an easement in the Wall for advertising purposes.

Even if the Wall's character as a party wall was not sufficient to vest the right to the advertising revenue in Weiner as a matter of law, the evidence establishes beyond question that Weiner would be entitled to an easement in the advertising revenue by prescription.  Under Oregon law, the period of use required to establish a prescriptive easement is ten years.  <u>Motes v. Pacificorp</u>, 217 P.3d 1072 (Or. App. 2009).  The owner of the Weiner Lot has used the Wall for advertising for nearly fifty years.  That use has been under a claim of right, and has been open, visible and continuous.  At least one prior owner of the Postal Building recognized Weiner's use as under a claim of right as early as 1984, twenty-three years before Debtor challenged such use in 2007.

Page 16 - MEMORANDUM OPINION

II.    <u>Trespass</u>

Debtor asserts that the elements of trespass are "well known and straightforward." All that is required to establish trespass is proof of an "intentional invasion of a possessor's interest in the exclusive possession of land." <u>Hager v. Tire Recyclers, Inc.</u>, 136 Or. App. 439, 445 (1995). Further, "[a]ny physical intrusion by a person onto another's land <u>necessarily interferes</u> with the possessor's right to exclusive use of the land." <u>Halperin v. Pitts</u>, 250 P.3d 402, 404 (Or. App. 2011) (Emphasis added).

A.    <u>Debtor's Trespass Claims</u>

Debtor asserts that Weiner's mere use of the Wall for advertising constitutes a trespass because that use interfered with Debtor's rights as the owner of the Wall to generate revenue from its own use of the Wall for advertising. Debtor asserts that the measure of damages for the trespass should be the advertising revenues that Weiner has wrongfully generated from its trespass. As noted above, however, Weiner is the owner of the portion of the Wall subject to the leases to Clear Channel for advertising. Debtor holds an easement of support in the Wall. Thus, Debtor does not hold the "exclusive right to use" the Wall necessary to establish a claim for relief for trespass. In any event, no evidence was presented that Weiner ever trespassed on the Debtor's portion of the Wall.

Debtor also asserts it is entitled to recover damages based upon the "anchoring or bolting the stretched fabric billboard

Page 17 - MEMORANDUM OPINION

signs directly into the Postal Building's easterly wall." This presents a more difficult issue. The evidence establishes that a portion of the Wall in fact has been damaged by Clear Channel's attachment of a bolted anchoring plate to an upper corner of the Wall.

Debtor asserts that Weiner and Clear Channel have trespassed, and continue to trespass, on Debtor's property "by anchoring or bolting the stretched fabric billboard signs directly into the Postal Building's easterly wall." Because its rights in the Wall are limited to an easement for support, Debtor can establish a claim for relief for trespass only to the extent that Weiner and/or Clear Channel's actions in connection with the Wall have interfered with that right of support.

The evidence at trial establishes that Clear Channel damaged the brick and mortar of the Wall where it installed eyebolts that proved insufficient to support the weight of a new "mesh" advertising system installed in January 2009. <u>See</u> Testimony of Zachary Jones. To install the bolts, Mr. Jones drilled holes into the brick to a depth of at least 3-1/2 inches, which were then filled with solid epoxy and the bolts inserted to hold a plate in place. Cable is then run through the eyebolts and attached to the mesh advertising.

Damage to the structural integrity of the wall implicates Debtor's easement of support in the Wall. Accordingly, Debtor is entitled to damages, in an amount sufficient to repair the Wall, based upon Clear Channel's trespass, <u>i.e.</u>, its interference with

Debtor's right to its easement of support.

The amount of those damages is problematic. The Debtor and Clear Channel each obtained bids for repair work to the Wall. The Debtor's witness, Dan Ward of Willamette Painting Co., testified in support of his repair bid of $22,640. Mr. Ward testified from approximately 40 years' experience as a painting contractor, specializing in repair and restoration work on older buildings, primarily in the Portland downtown core area. His bid specified that an area of 12' by 12' at the upper left corner of the Wall would need to be "opened up, tuck pointed, sealed, acid cleaned, re-plastered and painted" to complete repairs. See Exhibit FF. He testified that he would not know exactly how much area of the Wall would need to be repaired until bricks and deteriorating mortar were removed, which had not been done, and the work required would involve more masonry repair than painting. On cross-examination, Mr. Ward admitted that Willamette Painting Co. was not a licensed contractor, with its license having been revoked/suspended in 2005 for not paying unemployment taxes/unemployment insurance. He further admitted that Willamette Painting Co. had been fined twice for unlicensed work in 2010.

Clear Channel's witness, Jeff Maiden of Duff Maiden Mason Contractor, Inc. ("Duff Maiden"), testified in support of his repair bid of $3,650, based on his 38 years' experience "laying brick." His bid contemplated removing a portion of the sheet metal cap at the top of the Wall and removing and repairing bricks and mortar from an approximate 2' by 2' area of the Wall. See Exhibit

Page 19 - MEMORANDUM OPINION

101. He added $700 for metal work on the sheet metal cap that was not provided for in his bid, for a total repair bid of $4,350. Mr. Maiden admitted on cross-examination that he had no idea what he would find when bricks were removed from the upper left corner of the Wall. The deteriorating mortar was "almost like sand," and the problem becomes once you open up an area of bricks in the wall of an old building for repairs, "where do you stop."

Both of the parties' contractor witnesses had substantial experience dealing with masonry repairs on older buildings in Portland. However, Mr. Ward's testimony was undercut by his business's status as "licensed challenged." Both contractors also testified from a handicap in that the full extent of needed repairs would not be evident until bricks were removed and the damaged portion of the Wall actually was opened up. In these circumstances, I find that Willamette Painting Co.'s repair bid of $22,640 is too high for the work that likely is going to be required on the Wall, but Duff Maiden's repair bid is too low. In these circumstances, I find that a reasonable bid/cost for the required repairs to the Wall is $8,000, and the Debtor is entitled to damages in that amount for Clear Channel's trespass.

B.  Weiner's Trespass Claims

Weiner seeks damages for trespass based upon the continuing encroachment of the Postal Building on the Weiner Lot. Because I have determined that the Wall is a party wall, and that Weiner owns that portion of the Wall that is on the Weiner Lot, as a matter of law Weiner has no claim for relief for trespass against

Page 20 - MEMORANDUM OPINION

Debtor to the extent that the Wall encroaches on the Weiner Lot.

Weiner also seeks damages against Debtor based on the intrusion on the Wall and into the air space of the Weiner Lot of certain electrical equipment attached to the Wall which services the Postal Building. Weiner complains that the Debtor "maintains electrical panels, meters, and conduits" ("electrical equipment") on the Weiner Lot and "in the air space of the Weiner Property." Based on the evidence presented at the Trial, it is not entirely clear what Weiner is complaining about, although the Debtor clearly has installed an electrical meter serving the Postal Building on the east side of the Wall. However, Weiner submitted no evidence of damages resulting from the alleged trespass and accordingly has not met its burden of proof to prevail on its trespass claim. I conclude that Weiner has not proved its entitlement to an injunction requiring the Debtor to remove the electrical equipment from the Wall.

## Conclusion

Based on the foregoing findings, I conclude that Weiner is entitled to judgment on both claims stated in the Debtor's amended complaint, but the Debtor is entitled to a judgment on its trespass claim against Clear Channel in the amount of $8,000 damages. I further conclude that Weiner is not entitled to a declaratory judgment on its First Counterclaim, except to the extent consistent with the findings and conclusions stated in this Memorandum Opinion; Weiner's Second Counterclaim should be dismissed as moot; and the Debtor is entitled to judgment on Weiner's Third and Fourth

Page 21 - MEMORANDUM OPINION

1   Counterclaims.  Mr. Groce should prepare and submit a judgment

2   consistent with this Memorandum Opinion, approved as to form by

3   counsel for the Debtor and Clear Channel, within ten days following

4   its entry.

5                                ###

6   cc:       Edwin C. Perry
              Barry L. Groce
7             Craig G. Russillo